UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN F. HUGHES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 23-10361-AK |
| BAYSTATE FINANCIAL SERVICES, LLC, | ) | |
| IAFF FINANCIAL CORPORATION, | ) | |
| DAVID C. PORTER, | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT AND RECOMMENDATION ON
# IAFF FINANCIAL CORPORATION'S MOTION TO DISMISS
# AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT

March 5, 2024

DEIN, U.S.M.J.

## I. INTRODUCTION

Plaintiff John F. Hughes ("Hughes") brings this action against Baystate Financial Services, LLC ("Baystate"), IAFF Financial Corporation ("IAFF-FC"), and David C. Porter ("Porter") (collectively, the "Defendants"), asserting various claims against the Defendants following his termination as IAFF-FC's Director of Investment and Finance. Hughes's Complaint ("Compl." (Docket No. 1)) sets forth five (5) counts, asserting "Tortious Interference with Advantageous Employment Relations" against defendants Baystate and Porter (Count One); "Defamation" against defendants Baystate and Porter (Count Two); "Tortious Interference with Advantageous

Employment Relations" against defendant Becker (Count Three)[1]; "Wrongful Termination in Violation of Public Policy" against defendant IAFF-FC (Count Four); and "Violation of Dodd-Frank Act" against defendant IAFF-FC (Count Five). (Compl. ¶¶ 52-78).

This matter is presently before the court on "Defendant IAFF Financial Corporation's Motion to Dismiss" (Docket No. 26), by which IAFF-FC seeks to dismiss the two claims brought against it. This matter is also before the court on "Plaintiff's Motion to Amend Complaint" by which the Plaintiff is seeking to expand on the allegations of the Complaint and add additional state law claims against IAFF-FC. (Docket No. 31). After consideration of the parties' oral and written arguments, this court recommends to the District Judge to whom this case is assigned that IAFF-FC's Motion to Dismiss be ALLOWED, and that Plaintiff's Motion to Amend Complaint be ALLOWED in part and DENIED in part as provided herein.

## II. **STATEMENT OF FACTS**

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff[]." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). In the instant case, in addition to the Complaint, the court also considers an email submitted by defendant IAFF-FC as Exhibit A to its memorandum in support of its motion to dismiss ("Def. Mem., Ex. A" (Docket No. 27-1)), a document which has been "sufficiently referred to in the complaint" and whose authenticity is not in dispute. Watterson, 987 F.2d at 3; (see Compl. ¶¶ 46, 76). Accordingly, the relevant facts are as follows.

---

[1] On May 10, 2023, Hughes voluntarily dismissed defendant Kurt M. Becker from this action. (See Docket No. 24).

**Hughes Is Hired by IAFF-FC as Its Director of Investment and Finance**

In August of 2021, defendant IAFF-FC, a financial corporation responsible for providing investment services to members of the International Association of Fire Fighters ("IAFF"), hired John F. Hughes, an experienced, licensed "financial consultant and advisor," as its Director of Investment and Finance. (Compl. ¶¶ 1, 11-12, 22). Prior to his employment, Hughes had been in communication with IAFF-FC and had shared his visions of establishing the IAFF-FC as a "financial broker-dealer" in order to expand the financial services, products, and investment options available to the IAFF membership. (Id. ¶¶ 15-19, 21). Kurt Becker ("Becker"), an individual hired by IAFF-FC as its Chief Operating Officer in June of 2021, presented this vision to the IAFF-FC's Board of Directors (the "Board") and suggested that Hughes be hired to help IAFF-FC make such a transition. (Id. ¶¶ 20-22).

**Hughes Engages Baystate Financial Services, LLC, Natixis, and Franklin Templeton and Prepares the Necessary Broker-Dealer and Registered Investment Advisor Applications**

As part of his efforts to establish IAFF-FC as a broker-dealer, Hughes, in September of 2021, engaged defendant Baystate Financial Services, LLC ("Baystate") to gauge its potential interest in providing "financial planning and wealth management" services to the IAFF's membership. (Id. ¶ 25). In particular, these discussions centered around the use of certain "model portfolios" intended to increase the investment options available for IAFF members. (Id. ¶ 26). Hughes also had similar discussions with two other investment firms, Natixis and Franklin Templeton. (Id. ¶ 27). Throughout the fall of 2021, Hughes prepared the required broker-dealer registration and registered investment advisor applications for review and approval by the Securities and Exchange Commission ("SEC"), and he created three subsidiary companies—IAFF-FC Investments, LLC; IAFF-FC Insurance Agency, LLC; and IAFF-FC Advisors,

LLC—to that end. (Id.). At an IAFF-FC Board meeting held on February 18-19, 2022, the Board approved the "branded model portfolios" presented by Natixis and Franklin Templeton and authorized the IAFF-FC to "negotiate master services agreements" with each. (Id. ¶ 29).

### Becker's Alleged "Pay to Play" Scheme and Baystate's Involvement

Following the Board's decision to pursue relationships with Natixis and Franklin Templeton, Hughes alleges that Becker insisted that Hughes inform each firm of its need "to pay $250,000.00 up front to the IAFF-FC for the opportunity to do business with [it]." (Id. ¶ 31). When both firms "baulked" at Becker's alleged "pay to play" requirement over ethical concerns—as Hughes "had forewarned"—Becker decided to place the model portfolio project on hold "indefinitely." (Id. ¶ 32). Despite Hughes's insistence that the portfolios were "in the best interest of the Membership," Becker became angry and expressed his frustration with Hughes over his lack of support. (Id. ¶ 33).

In late May of 2022, plaintiff became aware that Baystate, through its owner and Managing Partner, defendant David Porter ("Porter"), had been engaging in private discussions with Becker about Baystate's potential role in partnering with IAFF-FC to provide the model portfolios. (Id. ¶¶ 6, 34-35). Because both Natixis and Franklin Templeton had declined to "pay to play," Becker allegedly insisted that Hughes discuss with Baystate the possibility of receiving "kickbacks" from Baystate while IAFF-FC's registered investment advisor application was pending with the SEC. (Id. ¶ 36).

In response to Becker's request, Hughes indicated that he believed such a "work around" to be "against state securities law" and a "red flag" for the SEC. (Id.). Believing his "personal licenses at risk" under such an arrangement, he instead proposed that IAFF-FC await

[4]

SEC approval before accepting any payments. (Id.). However, through a telephone conversation on May 27, 2022, Baystate allegedly confirmed to Hughes that it "was in fact willing to make kickback payments" to IAFF-FC while it awaited SEC approval, and that, while Baystate "could not legally make the payments" until the investment advisor application was approved, it would "simply falsely characterize the fees as 'convention or marketing fees'" and "essentially pay the fees under the table." (Id. ¶ 37).

**<u>Hughes Emphasizes His Concerns and Is Placed on a Performance Improvement Plan</u>**

On May 31, 2022, Hughes met with Becker, IAFF-FC Board member Jay Colbert, and IAFF President Edward Kelly ("Kelly") at Kelly's office in Washington, D.C. and discussed, among other things, the "proposed kickbacks" to be arranged with Baystate. (Id. ¶¶ 38-39). Hughes again stressed his ethical concerns and the potential consequences to the organization and IAFF's membership, and he further stated that he would be "required to report" the arrangement to the SEC if it were to go forward. (Id.). The complaint alleges that as a result of his objections, Hughes was placed, at Becker's insistence "and in retaliation" for his objections to the alleged kickback scheme, on a "performance improvement plan," "presented with a 'Conflict of Interest' policy," required to "continue to negotiate a side deal" with Baystate, and saw his job duties and responsibilities reduced. (Id. ¶¶ 40-41).

In December of 2022, Hughes once more voiced his ethical concerns to Becker—this time over a letter in furtherance of its investment advisor application which IAFF-FC's counsel had drafted for submission to the SEC, at Becker and Baystate's direction. (Id. ¶¶ 43-44). Specifically, Hughes alleges that the letter misrepresented IAFF-FC's commitment, as a prospective investment advisor, to offer certain services to IAFF's membership that, in reality, it

had no intention of offering. (Id.). On December 2, 2022, Hughes told Becker, via email, that he could not support such a letter because of the "gross misrepresentations" it contained, and he asked to meet with Becker, Baystate, and others, in order to "discuss alternatives." (Id. ¶ 44). Some communications took place and Hughes, under pressure, eventually indicated his support on December 22, 2022 for the letter's submission despite his concerns. (Id.).

### The SEC Complaint and Hughes's Termination

On January 12, 2023, Hughes was informed by Becker that his "ethical considerations were roadblocks that were causing Baystate considerable frustration" and that Baystate was strongly urging IAFF-FC to terminate his employment. (Id. ¶ 45). Aware of their mounting frustration but concerned with Baystate and IAFF-FC's inability to follow the supposed "ethical and legal requirements" applicable to the process, Hughes felt "compelled to bring his concerns" to the SEC's attention. (Id. ¶ 46). On January 17, 2023, Hughes sent an email to Jack Hogan of the SEC which forms the basis of Hughes' whistleblower/retaliation claims. (Id.; see Def. Mem., Ex. A). That email references an application which had been submitted by IAFF-FC Advisors, LLC, one of the IAFF-FC subsidiaries created by Hughes, and states in its entirety:

> Dear Mr. Hogan:
>
> Thank you for taking the time to speak with me concerning the above captioned matter the other day. As we discussed, I am the manager and Series 65 license holder for IAFF-FC Advisors, LLC ("FC Advisors"). *Unfortunately, at this juncture, I am required to report that I have serious ethical concerns related to FC Advisors' application, business plan and proposed operations.* Would you have any availability to discuss these concerns with me?
>
> Thank you.
>
> Jack Hughes.

(Def. Mem., Ex. A) (emphasis added). There is no evidence of any further communications, be it oral or written, between Hughes and the SEC.

The next day, on January 18, 2023, Hughes met with Becker and Kelly at Kelly's Washington, D.C. office. (Compl. ¶ 47). There, Kelly informed Hughes that as a result of his "complaints," things had not been "working out" and IAFF-FC would be terminating his employment effective "as of the end of April 2023." (Id.). In connection with his termination, Hughes was presented a severance agreement which "conditioned" payments on his agreement not to communicate with the IAFF membership—a condition Hughes would not agree to due to his "ethical and fiduciary duty to the Membership." (Id. ¶ 48). After Hughes refused to sign the agreement, which he characterizes as one "geared to ensur[e] his silence," IAFF-FC terminated Hughes's employment effective January 24, 2023 and declined to pay him any severance payments or health insurance benefits. (Id. ¶¶ 48-49). Hughes then filed the instant action on February 17, 2023. (See Docket No. 1).

Additional facts relevant to this court's analysis are detailed below.

### III. ANALYSIS

**A. Defendant IAFF Financial Corporation's Motion to Dismiss**

Defendant IAFF Financial Corporation has moved to dismiss Hughes's two claims against it pursuant to Fed. R. Civ. P. 12(b)(6).

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings. Thus, when confronted with such a motion, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. See Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 5 (1st Cir. 2005). Dismissal is only appropriate if the complaint, so

[7]

viewed, fails to allege "a plausible entitlement to relief." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane." García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)). This second step requires the reviewing court to "draw on its judicial experience and common sense." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Bell Atl., 550 U.S. at 555, 127 S. Ct. at 1964-65 (citations omitted). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Morales-Cruz, 676 F.3d at 224 (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)).

For reasons pertinent to its analysis, the court considers Count Five of the Complaint first.

Count Five – "Violation of Dodd-Frank Act"

IAFF-FC has moved to dismiss the Complaint's fifth count, "Violation of Dodd-Frank Act," on the basis that Hughes does not qualify as a "whistleblower" under 15 U.S.C. § 78u-6(a)(6) of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank" or the "Act") and therefore is not entitled to the Act's anti-retaliatory protections. (See Def. Mem. (Docket No. 27) at 10-14). For the reasons that follow, this court agrees.

The Act provides, among other things, "whistleblower" protection from alleged employment-related retaliation and discrimination as one of its intended financial regulatory reforms. To this end, Dodd-Frank enhanced the Securities Exchange Act of 1934 by adding 15 U.S.C. § 78u-6, the "Securities whistleblower incentives and protection" provision, which, in subsection (a)(6), defines a "whistleblower" as "any individual who provides . . . information relating to a violation of the securities laws to the [Securities and Exchange] Commission, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6); see Digital Realty Tr., Inc. v. Somers, 583 U.S. 149, 155-59, 138 S. Ct. 767, 773-76, 200 L. Ed. 2d 15 (2018). This "definition . . . describes who is eligible for protection" under Dodd-Frank.[2] Digital

---

[2] While an adjacent SEC regulation pertaining to retaliation protections under Section 78u-6(h) defines a whistleblower as an individual who provides information "that relates to a possible violation of the federal securities laws[,]" 17 C.F.R. § 240.21F-2 (emphasis added), the Supreme Court resolved any tension between the application of the regulation's definition versus that of the statute's when, in Digital Realty Tr., Inc., it considered an earlier version of this same regulation but found the less-expansive statutory definition in Section 78u-6(a)(6) controlling. Digital Realty Tr., Inc., 583 U.S. at 163, 138 S. Ct. at 778 ("In sum, Dodd-Frank's text and purpose leave no doubt that the term "whistleblower" in § 78u-6(h) carries the meaning set forth in the section's definitional provision."). See Trivedi v. Gen. Elec. Co., Civil Action No. 19-11862-PBS, 2020 WL 9744753, at *5 (D. Mass. Aug. 11, 2020), report and recommendation adopted, 2021 WL 2229088, at *1 (D. Mass. May 27, 2021) (construing 17 C.F.R. § 240.21F-2, under Digital Realty Tr., Inc., as "incorporat[ing] no broader definition of 'whistleblower' than that set out in the statute"). Trivedi, 2020 WL 9744753, at *5 n.9.

Realty Tr., Inc., 583 U.S. at 161, 138 S. Ct. at 777.  See Trivedi v. Gen. Elec. Co., Civil Action No. 19-11862-PBS, 2020 WL 9744753, at *5 (D. Mass. Aug. 11, 2020) (recommending dismissal of a Dodd-Frank whistleblower claim where there were "no facts alleged to show that [plaintiff] was a whistleblower within the meaning of the statute[.]"); Rimini v. JP Morgan Sec. LLC, No. 18-1031, 2018 WL 11229124, at *2 (1st Cir. 2018) (unpublished) (recognizing that "Dodd-Frank's anti-retaliation provision only protects individuals who have reported violations of the securities laws to the SEC[.]").

The anti-retaliation provision of Dodd-Frank provides in relevant part that an employer may not "discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower . . . because of any lawful act done by the whistleblower – (i) in providing information to the Commission in accordance with this section[.]"  15 U.S.C. § 78u-6(h)(1)(A)(i).  The whistleblower may bring suit in federal court to enforce these rights.  15 U.S.C. § 78u-6(h)(1)(B).  Thus, "[t]o bring a Dodd-Frank retaliation claim, a plaintiff must demonstrate that he suffered an adverse employment action after he made a report to the SEC based on 'a reasonable belief that the information (he provided) relates to a possible securities law violation.'"  Pickholz v. TransparentBusiness, Inc., Civil Action No.: 22-2504 (ES) (JBC), 2024 WL 489543, at *5 (D.N.J. Feb. 8, 2024) (quoting Digital Realty Tr., Inc., 583 U.S. at 158, 138 S. Ct. at 775).  See 17 C.F.R. § 240.21F-2(b)(1)(i)-(ii).

Importantly, Dodd-Frank's anti-retaliation provision in Section 78u-6(h) offers protection for "whistleblowers" only.  Thus, "an individual who falls outside the protected category of 'whistleblowers' is ineligible to seek redress under the statute, regardless of the

conduct in which that individual engages." Digital Realty Tr., Inc., 583 U.S. at 161, 138 S. Ct. at 777.

Although Dodd-Frank does not specifically address the scope of the notice needed to be provided to the SEC, courts have consistently recognized that the employee must have provided "information relating to a violation of the securities laws" – generalized allegations "wholly untethered from the elements of any particular violation" are insufficient to invoke the protections of Dodd-Frank. See Cellucci v. O'Leary, 19-CV-2752 (VEC), 2020 WL 977986, at *10 (S.D.N.Y. Feb. 28, 2020) (dismissing Dodd-Frank claim where the complaint did "not even identify a specific provision or section that may have been violated[,]" but rather contained the generic allegation that the plaintiff "reasonably believed" the alleged misconduct "was in violation of . . . Dodd-Frank and U.S. Securities Laws."); Lawrence v. Int'l Bus. Mach. Corp., 12cv8433(DLC), 2017 WL 3278917, at *10 (S.D.N.Y. Aug. 1, 2017) ("While a whistleblower need not establish that the employer's conduct actually violated an enumerated provision of the securities laws . . . the Second Circuit has expressed skepticism toward the proposition that a whistleblower's complaint need not even approximate specific elements of the enumerated provisions alleged violated[.]") (additional citation and quotations omitted).

In the instant case, assuming without deciding that the email Hughes sent was sufficient to notify the SEC "in a manner established, by rule or regulation, by the Commission," 15 U.S.C. § 78u-6(a)(6),[3] he did not assert therein that there had been a violation of securities laws, much

---

[3] SEC regulations require that the notice be in writing. See 17 C.F.R. § 240.21F-2(a)(1). Therefore, any oral communications Hughes may have had with someone from the SEC would not satisfy the notice requirement.

less identify any specific laws. Rather Hughes merely stated that he had "serious ethical concerns related to FC Advisors' application, business plan and proposed operations." (Def. Mem., Ex. A). It is undisputed that this is the only communication with the SEC on which Hughes bases his whistleblower status. However, this email is insufficient to notify the SEC of any violation or potential violation of securities laws. See Pickholz, 2024 WL 489543, at *5 (and cases cited) (recognizing that, "though a plaintiff need not prove an actual violation of the federal securities laws, a plaintiff must at least plead which laws he reasonably believed were violated, and what conduct he reported to the SEC."); Erhart v. Bofl Holding, Inc., 612 F. Supp. 3d 1062, 1107 (S.D. Cal. 2020) (summary judgment on Dodd-Frank claim awarded to defendant where plaintiff reported "various categories of believed misconduct" but failed to demonstrate that the alleged misconduct "sufficiently relate[d] to a violation of the Securities laws."). Therefore, Hughes does not qualify as a whistleblower, and he cannot invoke the anti-retaliation provisions of the Act. His fifth cause of action must be dismissed. See Fitzpatrick v. Milwaukee Sch. of Eng'g, Case No. 18-cv-0541-bhl, 2020 WL 7060133, at *7 (E.D. Wis. Dec. 2, 2020) (summary judgment for defendant on Dodd-Frank claim where plaintiff complained to SEC about employer's conduct but failed to identify any securities law violation).

Count Four – "Wrongful Termination in Violation of Public Policy"

IAFF-FC has also moved to dismiss the Complaint's fourth count, which asserts a claim for "Wrongful Termination in Violation of Public Policy." By its motion, IAFF-FC contends that the Complaint's alleged misconduct does not fall within an exception to the at-will employment doctrine, and that, even if it did, any common-law wrongful termination claim would

nevertheless be precluded by the remedial statutory scheme already presented by Dodd-Frank. (See Def. Mem. at 2, 4-9). This court agrees.

As an initial matter, while both parties recognize the wrongful termination claim as one which arises under state law, they disagree with respect to which state's law applies. The Defendants cite to Massachusetts law while Hughes contends that the law of the District of Columbia should apply, as that is where he was employed. (See Def. Mem. at 4; Pl. Opp. (Docket No. 29) at 12-13 n.6). Nevertheless, both parties agree that the choice-of-law issue does not need to be resolved in the instant case since there is no conflict between the law of Massachusetts and the law of the District of Columbia. (Pl. Opp. at 12-13 n.6; Def. Reply (Docket No. 30) at 5 n.1). This court agrees. See Levin v. Dalva Bros., 459 F.3d 68, 73 (1st Cir. 2006) ("An initial task of a choice-of-law analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions.") (citing Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29 (1st Cir. 1997)); Steinke v. Sungard Fin. Sys., Inc., 121 F.3d 763, 775 (1st Cir. 1997) (court declines to resolve choice of law issue where "'the outcome is the same under the substantive law of either jurisdiction.'") (quoting Lambert v. Kysar, 983 F.2d 1110, 1114 (1st Cir. 1993)).

Both Massachusetts and the District of Columbia recognize an at-will employment doctrine, and each permit a narrow exception to that rule where the termination at issue is one which has violated public policy. In Massachusetts because "an at-will employee can be fired at any time 'for almost any reason or for no reason at all[,]'" to "raise a cognizable claim," it must be shown that the "discharge falls within the limited exception prohibiting employers from firing at-will employees 'for reasons that violate public policy.'" Guilfoile v. Shields Pharmacy,

LLC, No. 16-cv-10652, 2021 WL 4459515, at *7 (D. Mass. Sept. 29, 2021) (quoting Wright v. Shriners Hosp. for Crippled Child., 412 Mass. 469, 472, 589 N.E.2d 1241, 1244 (1992); Flesner v. Tech. Commc'ns Corp., 410 Mass. 805, 810, 575 N.E.2d 1107, 1110 (1991)). Such public policy violations have traditionally arisen, "at the least, from a termination punishing an employee's assertion of a legally guaranteed right, compliance with a legal requirement, or refusal to commit prohibited conduct." Ryan v. Holie Donut, Inc., 82 Mass. App. Ct. 633, 636, 977 N.E.2d 64, 67 (2012).

Within the District of Columbia, the common-law tort of wrongful discharge is recognized "as an exception to the traditional at-will doctrine governing termination of employment, where the discharge violates a clear mandate of public policy." Vasquez v. Whole Foods Market, Inc., 302 F. Supp. 3d 36, 54 (D.D.C. 2018) (quoting District of Columbia v. Beretta, USA, Corp., 872 A.2d 633, 645 (D.C. 2005)) (additional citation and quotations omitted). This public policy exception has been articulated by District of Columbia courts as one which is "narrow" and reserved only for "those that make a clear showing, based on some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution, that a new exception is needed." Id. (quoting Rosella v. Long Rap, Inc., 121 A.3d 775, 778 (D.C. 2015)).

Significantly, both Massachusetts and the District of Columbia recognize that a common-law claim for wrongful termination is precluded where there is an existing statutory framework which already addresses the public policy at issue. See Vasquez, 302 F. Supp. 3d at 54 ("[e]ven where there is a showing of a clearly identifiable policy, the D.C. Court of Appeals has refused to find new exceptions to the doctrine of at-will employment where the legislature

[14]

has already create(ed) a specific, statutory cause of action to enforce the public policy at issue.") (additional citation and quotations omitted); Perez v. Greater New Bedford Vocational Tech. Sch. Dist., 988 F. Supp. 2d 105, 113 (D. Mass. 2013) ("[t]he cause of action for wrongful termination in violation of public policy does not apply where there is a comprehensive remedial statute, (and) the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme. . . It makes no difference whether the remedial scheme is created by state or federal law.") (additional citations and quotations omitted).[4] Thus, there is no "common law cause of action where the relevant public policy has already been vindicated by a state or federal statute." Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 45 (1st Cir. 1999).

Of relevance to the instant case, courts have expressly recognized that "a statute itself may provide that an employer may not terminate an employee for exercising rights conferred by the statute, and in such a case, the common law public policy exception is not called into play." King v. Driscoll, 418 Mass. 576, 584 n.7, 638 N.E.2d 488, 493 n.7 (1994). That is because under such circumstances, "no common law rule is needed because the Legislature has also prescribed a statutory remedy." Mello v. Stop & Shop Companies, Inc., 402 Mass. 555, 557, 524 N.E.2d 105, 106 (1988). And this is true even where the statutory scheme does not provide

---

[4] See also Taylor v. Fannie Mae, 65 F. Supp. 3d 121, 127 (D.D.C. 2014) ("where there is already a statutory framework in place, there is 'no need to create a new exception to the at-will employment doctrine.'"); Jones v. D.C. Water & Sewer Auth., 943 F. Supp. 2d 90, 94 (D.D.C. 2013) ("[n]ot only must a plaintiff plead a 'clear mandate of public policy,' but this public policy must be one that is not already protected by another statute."); Sawyer v. Kindred Healthcare, Inc., 186 F. Supp. 3d 118, 127 (D. Mass. 2016) (summary judgment for defendant where plaintiff's wrongful termination claim was "based on the same factual allegations" that underpinned her whistleblower claim and the wrongful termination claim "[was] barred" by an existing "detailed statutory remedy").

[15]

relief to a specific plaintiff: "the proper inquiry is not whether the remedial statute provides a petitioner with all of the remedies that might be available at common law. A legislature may validly decide that the proper balance consists in limiting the remedies available to a claimant[.]" Dineen v. Dorchester House Multi-Service Ctr., Inc., Civil Action No. 13-12200-LTS, 2014 WL 458188, at *5 (D. Mass. Feb. 3, 2014) (quoting Carter v. Tropicana Prods. Sales, Inc., Civil Action No. 07-10921-RWZ, 2008 WL 190791, at *3 (D. Mass. Jan. 4, 2008)). See also Guilfoile, 2021 WL 4459515, at *7 (summary judgment for defendants on wrongful termination claim where False Claims Act ("FCA") statute—the "operative 'comprehensive remedial statute'"—precluded plaintiff's wrongful termination claim, even though plaintiff's separate FCA retaliation count was also dismissed). To hold otherwise would allow the common law "public policy" cause of action to interfere with statutory schemes. See Perez, 988 F. Supp. 2d at 113.

In the instant case, Hughes is claiming that he was retaliated against due to his complaints about the company's potential violation of securities laws and his interactions with the SEC. Specifically, he describes his claim for wrongful termination in violation of public policy as being premised on his refusal to lie to the SEC, which would subject him to criminal liability under 18 U.S.C. § 1001,[5] and for reporting his concerns to the SEC. (Pl. Opp. at 12-14; see also

---

[5] To the extent Hughes now alleges in his opposition that IAFF-FC was asking him to violate 18 U.S.C. § 1001 by "lying to the SEC" (Pl. Opp. at 12), this is a new assertion not found within his Complaint. See Cadegan v. McCarron, No. Civ. 00–540–JD, 2001 WL 716111, at *2 (D.N.H. June 25, 2001) ("[t]he plaintiffs cannot overcome the deficiencies in their complaint with new arguments and allegations raised for the first time in response to the defendant's motion to dismiss."). But even in considering this argument, a wrongful termination claim predicated on an alleged violation of Section 1001 would also be subsumed by Dodd-Frank's remedial statutory scheme. See Taylor, 65 F. Supp. 3d at 127 (a common law claim of retaliation/wrongful termination for being asked to violate 18 U.S.C. § 1001(a) is precluded by Dodd-Frank).

Compl. ¶¶ 70, 72, 76-77). This behavior, and the "public policy" of protecting whistleblowers from retaliation for disclosing unlawful conduct is precisely the public policy protected by the Dodd-Frank Act. Indeed, Hughes' "common law claim not only invokes the same public policy established by the federal statute, it arises from the very acts giving rise to [his] federal claim." Dineen, 2014 WL 458188, at *4 (dismissing wrongful termination claim where an existing federal statute "provide[d] a remedy to [plaintiff] for termination.").

Accordingly, this court recommends that "Defendant IAFF Financial Corporation's Motion to Dismiss" (Docket No. 26) be ALLOWED and Counts 4 and 5 of the Complaint be dismissed. As described below, this court also concludes that any attempt to amend these counts would be futile, so the dismissal of these counts should be with prejudice.

### B. Hughes Motion to Amend the Complaint

Hughes' "Motion to Amend Complaint and Incorporated Memorandum of Reasons" ("Pls. Mot. Am.") (Docket No. 31) requests that the court permit him leave to amend his Complaint in accordance with Fed. R. Civ. P. 15(a). Specifically, Hughes contends that the proposed Amended Complaint, which is attached as Exhibit A to his Motion, "provid[es] additional facts in support of his existing claims" and "assert[s] additional counts against Defendant IAFF-FC[.]" (Pls. Mot. Am. at 1-2). Included in the proposed amended complaint are counts for "Wrongful Discipline and Termination in Violation of Public Policy" (Third Cause of Action), which the court will refer to as the "retaliation claim," and a count alleging a "Violation of Dodd-Frank Act" (Fourth Cause of Action).[6] IAFF-FC has opposed the motion and argues that

---

[6] In the proposed Amended Complaint, the Third Cause of Action entitled "Wrongful Discipline and Termination in Violation of Public Policy" is substantially identical to the Fourth Cause of Action in the original complaint, entitled "Wrongful Termination in Violation of Public Policy" as discussed above. In

[17]

any amendment would be futile as the proposed Amended Complaint "adds nothing to the allegations relevant to the Dodd-Frank claim" and instead "seeks to add new allegations and new claims that arise solely under state or local law and do not give rise to federal jurisdiction." (Def. Opp. Mot. Am. (Docket No. 37) at 2). Consequently, the Defendant has not addressed the sufficiency of the new proposed state law claims. (See Def. Opp. Mot. Am. at 8 n.4).

This court agrees that the proposed amendment to the Dodd-Frank and retaliation claims would be futile but finds that this federal court would have jurisdiction over the state law claims based on diversity jurisdiction. Therefore, this court recommends that Hughes be permitted to amend his complaint, except for his Dodd-Frank and retaliation claims, without waiver of IAFF-FC's right to raise any defenses it believes are appropriate.

Pursuant to Fed. R. Civ. P. 15(a)(2), a court "should freely give leave [to allow amendment] when justice so requires." But even under a liberal construction, "amendment is not warranted if it would be futile." U.S. ex rel. Goulden v. BAE Sys. Info. & Elec. Sys. Integration, Inc., Civil Action No. 11-12017-NMG, 2014 WL 3897645, at *4 (D. Mass. Aug. 7, 2014) (citing Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994)). "An amendment is 'futile' if the amended claim would fail to state a claim upon which relief can be granted." Id. (denying leave to amend False Claims Act claim). Ultimately, Fed. R. Civ. P. 15(a) "affords courts

---

the proposed Amended Complaint, the Fourth Cause of Action, "Violation of Dodd-Frank Act" is substantively identical to the Fifth Cause of Action of the original complaint, entitled the same, as discussed above.

broad discretion in deciding whether to allow or deny leave to amend." Sosa v. Mass. Dep't of Correction, 654 F. Supp. 3d 33, 37 (D. Mass. 2023).

The court agrees, in light of the proposed Amended Complaint's failure to adequately amend its allegations, that even when "gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)[,]" Hughes' proposed amendment is futile with respect to his Dodd-Frank and retaliation claims. Transwitch Corp. v. Galazar Networks, Inc., 377 F. Supp. 2d 284, 290 (D. Mass. 2005) (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001)). Indeed, it does not appear that Hughes has amended the allegations supporting his Dodd-Frank claim in any manner which would establish him as a whistleblower under the statute. Since the court has already considered the January 17, 2023 email, which is the sole report alleged to have been made to the SEC, there is no basis to amend this claim. Similarly, Hughes has not asserted any new facts or law which would allow him to assert a common law claim of retaliation that was not precluded by the Dodd-Frank statutory scheme. Consequently, this Court recommends that Hughes' request to amend his complaint with respect to these two claims be denied. Meng-Lin Liu v. Siemens A.G., 978 F. Supp. 2d 325, 332-33 (S.D.N.Y. 2013) (declining to provide leave to amend where any amendment made by plaintiff to his Dodd-Frank claim "would be futile.").

However, this court does not agree that, with the dismissal of the Dodd-Frank claim, it now lacks subject-matter jurisdiction over the state law claims. Although Hughes asserted subject matter jurisdiction based upon federal question jurisdiction alone (see Compl. ¶ 8), the

"existence of diversity jurisdiction" is "evident on the face of the complaint[.]" Soler v. Puerto Rico Telephone Co., 230 F. Supp. 2d 232, 234 (D.P.R. 2002). (See Compl. ¶¶ 2-6). "[A] federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction." McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004). Therefore, this court recommends that Hughes be permitted to amend his complaint with the exception of the retaliation and Dodd-Frank claims. The defendant may then raise any defenses, including those pursuant to Fed. R. Civ. P. 12(b)(6), it deems appropriate.

## IV. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that "Defendant IAFF Financial Corporation's Motion to Dismiss" (Docket No. 26) be ALLOWED, and "Plaintiff's Motion to Amend Complaint" (Docket No. 31) be ALLOWED in part and DENIED as to the proposed Third and Fourth Causes of Action.[7]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[7] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this court within 14 days after being served with this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which the objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).